# Exhibit A

Case Number: CACE-16-007602 Division: 14

Filing # 40730303 E-Filed 04/26/2016 01:54:26 PM

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA.

CASE NO.:

DIMATTINA HOLDINGS, LLC, a Florida
limited liability company,

        Plaintiff,

vs.

STERI-CLEAN INC., a California corporation,
and CORY CHALMERS, individually,

        Defendants.

_____/

## COMPLAINT

Plaintiff, DIMATTINA HOLDINGS, LLC ("Plaintiff"), sues Defendants, STERI-CLEAN INC. ("Steri-Clean") and CORY CHALMERS ("Chalmers") [Steri-Clean and Chalmers, collectively "Defendants"], and states as follows:

### Parties, Jurisdiction and Venue

1.    This is an action for fraudulent inducement involving damages in excess of $15,000.00, exclusive of interest, costs, and attorneys' fees, and declaratory relief pursuant to Chapter 86, Florida Statutes, over which this Court has jurisdiction.

2.    Plaintiff is a limited liability company organized and existing under the laws of the State of Florida, having its principal place of business in Hollywood, Broward County, Florida, which formerly operated a startup franchised business that remediated property affected by hoarding and damage associated with hoarding, death, trauma and bodily fluids.

3.    Defendant, Steri-Clean, is a corporation organized and existing under the laws of the State of California, having its principal place of business in Rancho Cucamonga, California,

*** FILED: BROWARD COUNTY. FL HOWARD FORMAN. CLERK 4/26/2016 1:54:25 PM.****

which, upon information and belief, has registered or acquired the rights to a Federal registration of the trademark "Steri-Clean" and related design and which, together with its owner, Chalmers, has offered franchise opportunities to independent persons and business entities, including Plaintiff, granting such intended franchisees the right to use the name "Steri-Clean" in connection with  startup service centers to provide remediation for property affected by hoarding and/or damage associated with hoarding, death, trauma and bodily fluids.

4.      Defendant, Chalmers, is an individual residing in Idaho, is over the age of eighteen (18) and is otherwise, sui juris, and is co-owner of a controlling interest in Defendant, Steri-Clean.

5.      Long-arm jurisdiction exists under Florida's Long Arm Statute § 48.193 against Defendants, since at all times material hereto, the Defendants:

(a)      Operated, conducted, engaged in, or carried on a business or business venture within the State of Florida by, among other things, all of which transpired within this State as more particularly set forth below;

(b)      Committed tortious acts within the State of Florida as more particularly set forth below;

(c)      Caused injury to Plaintiff and/or its property within the State of Florida arising out of an act or omission by Defendants, all of which transpired within this State as more particularly set forth below;

(d)      Conducted and engaged in substantial and not isolated business activities within the State of Florida resulting in injury to Plaintiff in the State of Florida.

6.      Venue is proper in Broward County, Florida because the acts which give rise to this action occurred in Broward County, Florida.

2

## General Allegations

7.      Chalmers has promoted himself on a reality television show known as "Hoarders", purporting to be qualified to advise and train persons such as Plaintiff in proper techniques and methods for remediating properties affected by hoarding as a profitable business opportunity. He has attempted to capitalize on the foregoing television exposure and induce persons such as Plaintiff to buy "franchises" and pay his company, Steri-Clean, substantial sums to obtain training for operation of a startup independent "hoarding" remediation business using the name "Steri-Clean".

8.      Offers of franchises are regulated by the Federal Trade Commission ('FTC") Rule, which requires a franchisor to provide prospective franchisees with a complete and accurate basic disclosure document containing twenty categories of information, 16 C.F.R. §436.l(a)(l)-(a)(20).  The FTC has required franchisors to comply with the Franchise Rule by furnishing prospective franchisees with disclosures in a format known as the Franchise Disclosure Document ("FDD") and expressly requires adherence to the enumerated disclosure requirements in their "entirety.

9.      On or about January 5, 2015, Plaintiff executed a "Steri-Clean Franchise Agreement" ("Franchise Agreement") offered by Chalmers and Defendant Steri-Clean, a copy of which is annexed hereto as **Exhibit A**, induced to do so based upon several false statements and omissions made by Chalmers.

10.      Plaintiff is owned by two Florida individuals who trusted Chalmers and believed his unfounded claims to be qualified to train and advise a startup hoarding remediation business and that such business would be profitable in the South Florida "territory" described in the Franchise Agreement.

11.     Chalmers and Steri-Clean had no factual empirical basis for concluding that a "hoarding or remediation business" could be profitable in the Territory for which the franchise was offered. In fact, they knew or should have known that such a market did not exist in the Territory.

12.     Plaintiff paid a "Franchise Fee" of Thirty-Five Thousand ($35,000.00) Dollars to Defendant, Steri-Clean, plus a One Thousand ($1,000.000 Dollar software activation fee, and thereafter invested in excess of One Hundred Fifty ($150,000.00) Dollars in marketing, promotion and leasing and creating an office center for servicing anticipated clients as instructed by Chalmers. Among other expenses, the Franchise Agreement provided for minimum monthly payments – royalties – and marketing fees – *regardless of whether the franchised business had any revenue at all.*   After eleven months of diligent efforts at marketing and promotion but operating at a loss in every month but one, Plaintiff ceased its franchised business.

13.     Plaintiff has engaged the undersigned attorneys to prosecute this action and has agreed to pay the law firms a reasonable fee for their services and costs incurred.

14.     All conditions precedent to this action have occurred, been satisfied, or have otherwise been waived.

## COUNT I
### Fraudulent Inducement

15.     Paragraphs 1 through 15 are realleged as if fully set forth herein.

16.     Plaintiff asserts an action for fraudulent inducement against Defendants in connection with the offering of the subject Steri-Clean Franchise, seeking recovery of damages and, as to Defendant, Steri-Clean, rescission of the Franchise Agreement.

17.     The following are misrepresentations, false statements or omissions of material facts by Defendants:

4

(a)      Chalmers described and represented to Plaintiff that a Steri-Clean "Hoarders" website was "jammed" with appointments for hoarding jobs which would benefit Plaintiff once the Franchise Agreement was signed.  In fact, Chalmers was collecting advertising fees for ads appearing on that website by businesses *which were competitors of Plaintiff*, a clear conflict of interest, and damaging to Plaintiff;

(b)      Chalmers professed to be qualified to train Plaintiff and its personnel in the processes, equipment, and handling of hazardous and dangerous substances. In fact, Chalmers had no OSHA certification nor other certification qualifying him as an instructor competent to train and protect franchisees' employees, customers and others – as evidenced, among other examples, by his failure to describe filters required by the Center for Disease Control ("CDC") for use in respirators and facemasks to avoid exposure to hantavirus (from rat droppings) typically found in hoarding projects and from other  risks associated with the remediation work, including improper floor sealers to eliminate odors and improper instruction (contrary to applicable safety standards) regarding dangerous use of an ozone machine;

(c)      The Franchise Rule requires the disclosure of the business experience of franchisor's current directors and executive officers.  The FDD failed to disclose that Steri-Clean's Director of Sales and Marketing had business interests in competitors of Steri-Clean;

(d)      The Franchise Rule requires that initial expenses of the franchise be fully disclosed; in fact the Steri-Clean FDD materially understated startup costs of the Steri-Clean franchise;

(e)      The Franchise Rule requires an accurate description of training offered. . In fact the Steri-Clean FDD described a minimum of 16 hours training per employee when in fact,

among four employees who traveled to California for training, one owner-employee received zero hours – and others no more than six hours;

(f)     Further, Steri-Clean was to provide a representative to provide a five days training visit to Florida, but Chalmers appeared briefly and left within three days;

(g)     The FDD describes a "Major Accounts Program" supposedly to provide franchisees with major clients doing business in several Territories. Details are supposedly in the Operations Manual, but none could be found. Furthermore, Chalmers stated to Plaintiff that they would be referred business from Hilton Hotels, Hertz Rent A Car, and "Safeguard" once Plaintiff signed the Franchise Agreement, but no business from these firms ever materialized.

18.     The above statements and omissions were misrepresentations of material fact.

19.     At the time Defendants made the misrepresentations and omissions, they knew or should have known that the statements were false.

20.     Defendants intended for the misrepresentations and omissions of material fact to induce Plaintiff to rely and act upon them, and Plaintiff did so reasonably rely and act, by executing the Franchise Agreement and paying Defendant Steri-Clean its fees and expending over One Hundred Eighty-Five Thousand ($185,000.00) Dollars in furtherance of an illusory business "opportunity".

21.     Plaintiff has suffered substantial damages as a result of their justifiable reliance on Defendants' misrepresentations, omissions, and conflicts of interest.

WHEREFORE, Plaintiff demands judgment against Defendants for the full amount of its monetary damages incurred, rescission of the Franchise Agreement in its entirety, restoration of Plaintiff to its financial condition prior to its damages caused by Defendants' fraudulent inducement, costs, and all such other and further relief as this Court deems just and proper.

## COUNT II
### Deceptive and Unfair Business Practice

22.     Paragraphs 1 through 21 are realleged as if fully set forth herein.

23.     Defendants' failure to provide accurate disclosures as set forth in 16 C.F.R. §436.1 constitutes an unfair or deceptive act in violation of the Federal Trade Commission Act, 15 U.S.C. §45(a)(1) and is, therefore, a violation of Florida's Deceptive and Unfair Business Practices Act (FDUPTA), F.S. §501.201, pursuant to 15 U.S.C. §45 (A)(1), 16 C.P.R. §436.1, 16 C.P.R. §436.2.

WHEREFORE, Plaintiff demands compensatory damages for violation of Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), F.S. [subsection] 501.201 et seq., which provides for recovery of "actual damages" i.e. out of pocket expenses incurred by Plaintiff, legal fees, costs, and such further relief as the Court may deem proper.

## COUNT III
### Breach of Contract

24.     Paragraphs 1 through 23 are realleged as if fully set forth herein.

25.     Defendant, Steri-Clean, has failed to comply with its obligations under the purported Franchise Agreement, to Plaintiff's substantial damage

WHEREFORE, Plaintiff, DIMATTINA HOLDINGS, LLC, demands judgment against the Defendants, STERI-CLEAN, INC. and CORY CHALMERS, plus interest, attorneys' fees, court costs, and such other and further relief as the Court may deem just and proper.

7

## JURY DEMAND

Plaintiffs hereby demand trial by jury for all matters so triable.

DATED at this 26th day of April, 2016

/s/ Douglas P. Solomon
**Douglas P. Solomon, Esq.**
Florida Bar No. 225800
dpsolomon@aol.com
**LAW OFFICES OF**
**DOUGLAS PAUL SOLOMON**
*Co-Counsel for Plaintiff*
One West Las Olas Blvd., Suite 500
Fort Lauderdale, FL 33301
(954) 525-4100
dpsolomon@aol.com

**Thomas R. Shahady, Esq.**
Florida Bar No. 092893
tshahady@kolawyers.com
krissehack@kolawyers.com (Legal Asst)
**John J. Shahady, B.C.S.**
Florida Bar No. 998990
JShahady@kolawyers.com
**KOPELOWITZ OSTROW**
**FERGUSON WEISELBERG**
*Co-Counsel for Plaintiff*
One West Las Olas Blvd., Suite 500
Fort Lauderdale, FL  33301
(954) 525-4100

# EXHIBIT A

# STERI-CLEAN®
# FRANCHISE AGREEMENT

W:\WDOX\CLIENTS\SCL\001\00076881.WPD
Franchise Agreement
Issued March 1, 2014
Revised May 15, 2014

# TABLE OF CONTENTS

1. PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

2. RECITALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-
    2.1. Ownership of System. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-
    2.2. Objectives of Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

3. DEFINITIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-
    3.1. CPI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-
    3.2. Designated Owner. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-
    3.3. Franchise Network. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-
    3.4. Good Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-
    3.5. Gross Revenue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-
    3.6. Location. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-
    3.7. Major Account Client. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-
    3.8. Manual. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-
    3.9. Marks. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-
    3.10. Proprietary Product. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-
    3.11. Related Party. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-
    3.12. SCI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-
    3.13. Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-
    3.14. Start Date. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-
    3.15. System. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-
    3.16. Termination. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-
    3.17. Territory. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-
    3.18. Trade Name. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-
    3.19. Transfer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-
    3.20. You. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-

4. FRANCHISED RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-
    4.1. Granting Clause. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-
    4.2. Territory. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-
    4.3. Rights Reserved. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-
    4.4. Relocation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-
    4.5. Term and Renewal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-
        4.5.1. Initial Term. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-
        4.5.2. Renewal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-
    4.6. Minimum Performance Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . -5-
        4.6.1. Your Responsibility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-
        4.6.2. Consequences of Failure to Meet. . . . . . . . . . . . . . . . . . . . . -5-

5. OUR SERVICES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-
    5.1. Initial Training Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-
    5.2. Manual. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-
    5.3. Suggested and Designated Suppliers. . . . . . . . . . . . . . . . . . . . . . . -6-
    5.4. Start-up Package. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-
    5.5. Marketing Fund. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-
        5.5.1. Administration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-
        5.5.2. Allocation of Expenditures. . . . . . . . . . . . . . . . . . . . . . . . . . -7-
        5.5.3. Repayment of Advances. . . . . . . . . . . . . . . . . . . . . . . . . . . -7-
    5.6. Web-Based Marketing Support. . . . . . . . . . . . . . . . . . . . . . . . . . . -7-
    5.7. Additional Training. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-
    5.8. Consultation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-
    5.9. Suggested Prices. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-
    5.10. Major Accounts Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-
    5.11. Administrative Support. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-

W:\WDOX\CLIENTS\SCI\001\00076881.WPD
Franchise Agreement
Issued March 1, 2014
Revised May 15, 2014

     5.12. Development of System. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-
     5.13. Proprietary Products Availability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-

6. YOUR PAYMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-
     6.1. Initial Franchise Fee. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
     6.2. Proprietary Software Activation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
     6.3. Royalty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
     6.4. Marketing Fund Contributions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
     6.5. Technology Fee. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
     6.6. On-line Lead Generation Deposit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-
     6.7. Payment of Ongoing Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-
     6.8. Audit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-
     6.9. Training Fees and Costs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-
     6.10. Renewal Fee. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-
     6.11. Transfer Fee. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-
     6.12. Annual Meeting Registration Fee. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-
     6.13. Declined Payment Charge. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-
     6.14. Administrative Processing Fee for Late Payment or Report. . . . . . . . . . . . . . . . -11-
     6.15. Interest on Late Payments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -12-
     6.16. Application of Payments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -12-

7. YOUR OBLIGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-
     7.1. Use of Trade Name and Marks. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-
          7.1.1. Context . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-
          7.1.2. Changes in Trade Name and Marks. . . . . . . . . . . . . . . . . . . . . . . . . . -13-
          7.1.3. Advertising Materials. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-
          7.1.4. Legal Protection. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-
     7.2. Quality Assurance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-
          7.2.1. Warehouse Location and Pre-Opening Development. . . . . . . . . . . . . . -13-
          7.2.2. Initial Training Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -14-
          7.2.3. Attendance at Additional Training. . . . . . . . . . . . . . . . . . . . . . . . . . . . -14-
          7.2.4. Opening. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -14-
          7.2.5. Compliance with Manual. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -14-
          7.2.6. Services Offered and Products Used. . . . . . . . . . . . . . . . . . . . . . . . . -14-
          7.2.7. Client Satisfaction Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-
          7.2.8. Maintenance and Upgrades. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-
          7.2.9. Professional Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-
          7.2.10. Observation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-
          7.2.11. Notification of Complaints. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-
     7.3. Attendance at Annual Meeting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-
     7.4. Personnel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-
          7.4.1. Management. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-
          7.4.2. Employees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-
     7.5. Advertising Obligations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-
          7.5.1. Grand Opening. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-
          7.5.2. Local Advertising. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-
          7.5.3. Signs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-
     7.6. Financial Information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-
          7.6.1. Records. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-
          7.6.2. Reports. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-
     7.7. Participation in Major Accounts Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-
     7.8. Insurance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-
     7.9. Financial and Legal Responsibility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-
          7.9.1. Compliance with Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-
          7.9.2. Payment of Indebtedness. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

8. RELATIONSHIP OF PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-
     8.1. Interest in Marks and System. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-
     8.2. Independent Status. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-
     8.3. Display of Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-
     8.4. Confidentiality. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-
     8.5. Indemnification. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

-ii-

8.6. Covenant Not to Compete. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-
8.7. Non-Solicitation of Employees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

9. TRANSFER OF FRANCHISE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-
9.1. Purpose of Conditions for Approval of Transfer. . . . . . . . . . . . . . . . . . . . . -20-
9.2. Notice of Intention to Transfer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-
9.3. Consent and Right of First Refusal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -21-
9.4. Conditions for Consent to Transfer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -21-
9.5. Assignments Not Treated as Transfers. . . . . . . . . . . . . . . . . . . . . . . . . . . -22-
9.6. Change of Ownership Upon Death or Total Disability. . . . . . . . . . . . . . . . . -22-
9.7. Assignment by SCI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -22-

10. TERMINATION OF FRANCHISE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-
10.1. Termination by Consent of the Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . -23-
10.2. Termination by SCI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-
10.2.1. Notice of Default. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-
10.2.2. Events of Default. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-
10.3. Rights and Obligations After Termination. . . . . . . . . . . . . . . . . . . . . . . . . -24-

11. MISCELLANEOUS PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-
11.1. Construction of Contract. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-
11.2. Governing Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-
11.3. Notices. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-
11.4. Amendments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-
11.5. Waiver. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-
11.6. Integration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-
11.7. Negotiation and Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-
11.7.1. Agreement to Use Procedure. . . . . . . . . . . . . . . . . . . . . . . . . -26-
11.7.2. Initiation of Procedures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -27-
11.7.3. Direct Negotiations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -27-
11.7.4. Mediation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -27-
11.8. Arbitration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -27-
11.9. Individual Dispute Resolution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -28-
11.10. Limitation of Actions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -28-
11.11. No Attorney Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -28-
11.12. Severability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -28-
11.13. Approval and Guaranties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -28-
11.14. Acceptance by SCI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -28-
11.15. Disclaimer of Representations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -28-

STATE SPECIFIC ADDENDUM TO STERI-CLEAN® FRANCHISE AGREEMENT

CONVERSION ADDENDUM TO STERI-CLEAN® FRANCHISE AGREEMENT

ATTACHMENTS:
1. Territory
2. Special Release of Claims
3. Authorization Agreement for Prearranged Payment
4. Nondisclosure and Noncompetition Agreement
5. Assignment of Telephone Numbers, Email Addresses and Web Addresses and Special Power of Attorney
6. Personal Guaranty and Subordination Agreement
7. Your Owners

W:\WDOX\CLIENTS\SCL\001\00076881.WPD
Franchise Agreement
Issued March 1, 2014
Revised May 15, 2014

# STERI-CLEAN® FRANCHISE AGREEMENT

## 1. PARTIES

This agreement is made between Steri-Clean, Inc. (SCI, we or us), a California corporation with its principal office in Rancho Cucamonga, California, and Dimattina Holdings LLC _____ [*franchisee's legal name*] (you).

## 2. RECITALS

### 2.1. Ownership of System

We have developed a unique branded system for operating a hoarding and biohazard cleanup service. We have spent time, effort, and money to develop the business methods, technical knowledge, specialized services, brand ideas, operational processes, trade secrets, commercial ideas, advertising materials, marketing strategies, information on sources of supply, employee uniforms, and training techniques that comprise the system. We own certain intellectual property rights, including the trade name and mark, STERI-CLEAN®, that we use to identify and promote the system.

### 2.2. Objectives of Parties

We would like to grant to you the right and you would like to accept from us the obligation to own and operate a regional hoarding and biohazard cleanup service (Service), using our Trade Name, Marks, and System, throughout the term of this agreement and according to its conditions.

## 3. DEFINITIONS

For purposes of this franchise agreement, when any of the following words and phrases begins with a capital letter, we define its meaning in this Article 3:

### 3.1. CPI

"CPI" means the Consumer Price Index: All Items/U. S. City Average - All Urban Consumers (1982-1984 = 100), published by the Bureau of Labor Statistics, U. S. Department of Labor, or a comparable index that we select if the above-referenced index is no longer published.

### 3.2. Designated Owner

"Designated Owner" means you in your role as ultimate supervisor of your STERI-CLEAN® Service or as an owner of at least fifty-one percent (51%) of your equity whom we have certified as your Designated Owner.

W:\WDOX\CLIENTS\SCI\001\00076881.WPD
Franchise Agreement
Issued March 1, 2014
Revised May 15, 2014

### 3.3. Franchise Network

"Franchise Network" means the interdependent network composed of us, all STERI-CLEAN® franchisees, our affiliates, and any other people or companies that we have authorized to use our Trade Name or Marks.

### 3.4. Good Standing

"Good Standing" means your timely compliance and that of your Related Parties with all provisions of this agreement and the Manual, specifically including provisions for timely payment of money that you owe to us or our affiliate.

### 3.5. Gross Revenue

"Gross Revenue" means the total amount of money or other consideration that you and your Related Parties receive for all services rendered within your Territory or in association with our Trade Name or Marks , less discounts and refunds.

### 3.6. Location

"Location" means the business address of your Service where you maintain your warehouse.

### 3.7. Major Account Client

"Major Account Client" means any client that conducts its business in more than one Territory and that we have designated as a Major Account Client.

### 3.8. Manual

"Manual" means "the operations manual and any other manuals, such as a training manual or marketing manual, that we will lend you or to which we will give you access on our intranet during the term of this agreement, as updated from time to time, containing information, forms, and requirements for the establishment and operation of a STERI-CLEAN® Service and for use of our Trade Name and Marks."

### 3.9. Marks

"Marks" means the trademarks, service marks, trade dress, logotypes, slogans, and other commercial symbols we authorize you to use under this agreement.

### 3.10. Proprietary Product

"Proprietary Product" means a product made according to our specifications or packaged or labeled with our Marks.

### 3.11. Related Party

"Related Party" or "Related Parties" means "your general partners, limited partners, shareholders, companies in which you have a controlling interest, companies in which any person or company owning a controlling interest in you also has a controlling interest, and your officers and directors."

-2-

### 3.12. SCI

"SCI" means Steri-Clean, Inc., or any person or company to which we allocate part or all of our rights and obligations under this agreement.

### 3.13. Service

"Service" means a hoarding and biohazard recovery service that we operate or that we have authorized a franchisee to operate under our Trade Name, Marks, and System.

### 3.14. Start Date

"Start Date" means the date when your STERI-CLEAN® Service begins to operate under our System or sixty (60) days after we sign this agreement, whichever is first. The Start Date may be extended only with our written consent.

### 3.15. System

"System" means the intellectual property that we license to you under this agreement, including the right to use our business methods, technical knowledge, web-based promotion, specialized services, brand ideas, operational processes, trade secrets, commercial ideas, advertising materials, marketing strategies, information on sources of supply, employee uniforms, and training techniques.

### 3.16. Termination

"Termination" means expiration of this agreement, non-renewal of this agreement, or termination of this agreement before its normal expiration date.

### 3.17. Territory

"Territory" means the geographic area in which you may operate a Service under this agreement.

### 3.18. Trade Name

"Trade Name" means the commercial name STERI-CLEAN.

### 3.19. Transfer

Except as described in Section 9.5 of this agreement, "Transfer" means any sale, gift, or other change in the majority beneficial ownership of: (1) rights in this agreement, (2) the capital assets of your STERI-CLEAN® Service, or (3) you.

### 3.20. You

"You" means the person or company that is named as "you" in Article 1 of this agreement." If you are an individual, "you" also means your Designated Owner. "You" means, in addition, all people or entities that succeed to your interest by Transfer or operation of law.

-3-

## 4. FRANCHISED RIGHTS

### 4.1. Granting Clause

We grant to you the right and obligation and you accept from us the right and obligation to own and operate a STERI-CLEAN® Service within a designated Territory under our Trade Name, Marks, and System during the term of this agreement and according to its provisions.

### 4.2. Territory

You may operate your Service within the Territory specified in Attachment 1 to this agreement. Except for the rights reserved below, we will not authorize any other franchisee or affiliate to operate within your Territory, operate any company-owned Service within your Territory, or allow any other STERI-CLEAN® franchisee, affiliate or company-owned Service to operate within your Territory.

You may operate outside your Territory only with our prior written consent. We will grant our consent only upon the following conditions:

(a) The area in which you wish to provide service is not included in another franchisee's territory or in a region currently served by a company-owned Service.

(b) You may not explicitly direct any advertising to prospective clients outside your Territory unless you can completely discontinue the advertising on fourteen (14) days' notice or less.

(c) When the area is granted to another franchisee, you agree to immediately stop providing service and turn over your list of prospects and clients in the external area to the franchisee to which the area has been granted without seeking or accepting any compensation for doing so. You must immediately discontinue any advertising you have directed to clients in the area. If you receive business leads for work within the external area after it has been granted to another franchisee, you must turn over the leads to that franchisee.

(d) You agree to immediately stop serving clients in the external area if we withdraw our consent to your operating there. We may withdraw our consent for any reason or for no reason at all.

### 4.3. Rights Reserved

We reserve the exclusive right to conduct or control Internet promotion and marketing, including the exclusive right to establish and use accounts in any of the social media using our Trade Name or Marks. We have the right to serve or to authorize others to serve Major Accounts Clients at locations within your Territory if you are unwilling or unable to do so according to the Major Account Program's prices and procedures.

We reserve all other rights not expressly granted to you in this agreement, including the right to establish Services anywhere outside your Territory, the right to establish, purchase or franchise businesses within your Territory if they are not operated under the STERI-CLEAN® Trade Name or Marks and do not primarily feature hoarding

-4-

and/or biohazard cleanup services, and the right to sell Proprietary Products through any means of distribution other than a hoarding and/or biohazard cleanup service within your Territory.

### 4.4. Relocation

You may relocate your warehouse within your Territory only with our prior written consent. You may not relocate to a site outside your Territory.

### 4.5. Term and Renewal

#### 4.5.1. Initial Term

The initial term of the franchise will begin on the Start Date and will continue for five (5) years.

#### 4.5.2. Renewal

You have the right to renew this franchise for consecutive additional five- (5-) year terms on the same terms and conditions as those on which we are customarily granting new franchises at the time of renewal if, at the time of renewal, you have fulfilled the following conditions:

(a) You and your Related Parties are in Good Standing under this agreement, any other agreement between us and you, and the Manual.

(b) You have notified us in writing at least one hundred eighty (180) days before the expiration date of this agreement of your wish to renew.

(c) You have signed a copy of the franchise agreement for the renewal term not less than ninety (90) days before the expiration of this agreement or thirty (30) days after you receive the renewal franchise agreement from us, whichever is later.

(d) Any Related Parties that have signed supplemental agreements in connection with this agreement have signed supplemental agreements for the renewal term.

(e) You and any Related Parties that are guarantors to this agreement have signed a special release of claims in the form of Attachment 2 to this agreement with respect to past dealings with us and our affiliates, and

(f) You have paid us the renewal fee described in Section 6.10 of this agreement.

The provisions of the standard franchise agreement we use at the time of renewal may be materially different from this agreement's provisions. Changed provisions may include increased royalties and advertising fund contributions.

### 4.6. Minimum Performance Standard

Maintenance of your right to operate your Service depends upon your meeting a quarterly Minimum Performance Standard.

#### 4.6.1. Your Responsibility

Beginning twelve (12) months after the Start Date, we will calculate your Gross Revenue each calendar quarter. To maintain your right to operate your Service, your

-5-

quarterly Gross Revenue must equal or exceed fifty thousand dollars ($50,000) per each 2 million residential population in the Territory (Minimum Performance Standard).

<u>4.6.2. Consequences of Failure to Meet</u>

If your Gross Revenue does not meet the Minimum Performance Standard for any calendar quarter, beginning with the fifth (5th) full calendar quarter after the Start Date, we will notify you in writing of that fact. Notification of failure to meet the Minimum Performance Standard during the fifth (5th) through eighth (8th) calendar quarters of the term of this agreement will be given for informational purposes only. Beginning with the ninth (9th) calendar quarter after the Start Date, if your Gross Revenue is less than the Minimum Performance Standard, it will be a material event of default giving us the right, in our sole discretion, to terminate your franchise upon ninety (90) days' written notice and opportunity to cure by meeting the Minimum Performance Standard in the following calendar quarter.

Beginning with the ninth (9th) full calendar quarter after the Start Date, if you do not meet the Minimum Performance Standard during any three (3) calendar quarters in any eight (8) consecutive calendar quarters and we have given you written notice of these deficiencies, we may, at our option, terminate this agreement upon ninety (90) days' written notice of the third deficiency, without opportunity to cure.

## 5. OUR SERVICES

We will perform the following services for you at times and places we select if you are in Good Standing under this agreement, any other agreement with us and the Manual:

### 5.1. Initial Training Program

Before the opening of your Service, we will conduct an initial training program in the operation of your Service under the STERI-CLEAN® System for you and your management. We will advise you on selecting and training employees.

### 5.2. Manual

We will lend to you or make available to you on our intranet a Manual containing explicit instructions for use of the Marks, specifications for goods that will be used in your Service, sample business forms, information on marketing, management, and administrative methods developed by us for use in your Service, names of designated or suggested suppliers, and other information that we believe may be necessary or helpful to you in your operation of your Service. We will revise the Manual periodically to meet the changing needs of the Franchise Network and will distribute updated pages containing these revisions to you , or, if the Manual has been placed on our intranet, will post revised pages there.

### 5.3. Suggested and Designated Suppliers

We will give you, in the Manual or otherwise in writing, names and addresses of suggested suppliers of specified goods and services to help you construct, remodel or decorate the premises for your Service and purchase or lease signs, fixtures and supplies.

-6-

We will give you, in the Manual or otherwise in writing, names and addresses of any designated suppliers of goods and services that you must use in your Service together with specifications for some of these items. In designating a particular supplier, **we expressly disclaim any warranties or representations as to the condition of the goods or services sold by the suppliers, including, without limitation, expressed or implied warranties as to merchantability or fitness for any intended purpose**. You agree to look solely to the manufacturer or supplier for the remedy of any defect in the goods or services.

### 5.4. Start-up Package

We will give you a start-up package of marketing materials, including brochures, business cards, and trade show displays at no additional charge.

### 5.5. Marketing Fund

#### 5.5.1. Administration

We will administer the marketing fund, which we will account for separately on the general ledger. The purpose of the fund is to pool our advertising money and that of our franchisees to achieve greater benefits for all in promoting the Trade Name and Marks. We may use the fund to create designs for banner fans, tablecloths and backdrops for trade show booths and templates for our logo, pamphlets, brochures, business cards, and stationery that you may download and print or produce for your own use. We may also use the fund to pay for a web site or sites that promote the STERI-CLEAN® Franchise Network, social media and other web-based advertising. In addition, we have the right to use fund money to pay for any creative content, materials or media that serves to generally promote the Franchise Network, including new media or technology as it develops. We may use up to twenty percent (20%) of fund money to compensate ourselves for overhead and other expenses incurred in our administration of the fund. Once a year, upon request, we will distribute to our franchisees, once a year upon request, a marketing fund report that will state the total amounts of money collected and spent by the Fund during the past year and list, by general category, the manner in which we spent the money.

#### 5.5.2. Allocation of Expenditures

We will give preference to marketing fund projects that are systemwide in scope, but we reserve the unqualified right to decide, in our sole discretion, where, when and how fund money will be spent.

#### 5.5.3. Repayment of Advances

We have the right to lend money to the marketing fund, without interest, and to repay ourselves from fund money during the same or a subsequent fiscal year.

### 5.6. Web-Based Marketing Support

We own the marks "Restoring Homes and Lives®" and "Hoarders.com™" that we use to promote the STERI-CLEAN® brand. You may use these marks in your marketing materials, such as business cards, brochures and displays at trade shows, according to the specifications and requirements for use that we give you in the Manual or

-7-

otherwise in writing. We will maintain one or more promotional web pages on our web site or sites that will list only your Service in your Territory and we will engage a professional web designer to maintain a separate page or pages for your Service on our web site. You may contribute material for inclusion on your web page, subject to our prior approval. We also maintain toll-free numbers to promote the brand. We will direct any leads generated for your Territory to you, although we have the right to substitute another provider if you are unable to offer service in response to any lead. We will place orders for third party online lead generation services on your behalf according to a budget upon which you and we agree. We will pay for those services from a deposit you maintain with us.

### 5.7. Additional Training

We will provide additional training to you and your management during the term of this agreement if we determine that additional training is needed.

### 5.8. Consultation

We will use our best efforts to make our personnel available to you for toll-free telephone, fax, email or on-line consultation on all aspects of your business in a timely manner for no additional charge. During the first six months of the franchise term, we will give you up to five (5) days of on-site assistance to coach you on employee recruitment and training and to help you resolve operations problems, if needed, without additional charge. After that, we will use our best efforts to provide on-site consultation to you in a timely manner. You must reimburse us for our direct costs in providing on-site assistance.

### 5.9. Suggested Prices

We will suggest pricing based on affiliate and franchisee feedback for various services that you may provide to clients. You may modify these prices to meet local competition and adjust to differences in expenses.

### 5.10. Major Accounts Program

We expect to develop a major account program in which you may participate, at your option, to help you attract larger business clients.

### 5.11. Administrative Support

We will research and select designated software or web-based applications that you must use for accounting, estimating, invoicing and generation of financial reports. We will analyze the digital reports you send us and provide recommendations based on your reports.

### 5.12. Development of System

We will continue to improve and develop the System based on the operations of our affiliate and feedback from franchisees.

### 5.13. Proprietary Products Availability

If we should develop Proprietary Products that you may or must use in your Service, we will use our best efforts to ensure that we or a designated supplier will always have a supply of Proprietary Products for sale to you at fair market value.

-8-

# 6. YOUR PAYMENTS

## 6.1. Initial Franchise Fee

When you sign this agreement, you will pay us in immediately accessible funds an initial franchise fee of thirty-five thousand dollars ($35,000), if this is your first franchise with us, or twenty-five thousand dollars ($25,000), if this is a subsequent franchise with us. We will reduce the fee for a subsequent franchise only if the same person or company has a controlling interest in both the franchisee who entered into the original franchise agreement and the franchisee who enters into the subsequent franchise agreement. The initial franchise fee is not refundable.

## 6.2. Proprietary Software Activation

When you sign this agreement, you will pay us in immediately accessible funds a one-time activation fee of one thousand dollars ($1,000) for Clean-Net, our web-based proprietary contact management and scheduling application.

## 6.3. Royalty

On Wednesday of each week, or on any other day that we designate in writing, you will pay us a weekly royalty of the greater of:

(a)     eight percent (8%) of Gross Revenue, as "Gross Revenue" is defined in Article 3 of this agreement,  if your weekly sales do not exceed eight thousand dollars ($8,000), seven percent (7%) if your weekly sales are between eight thousand and one dollars ($8,001) and twelve thousand dollars ($12,000), and six percent (6%) if your weekly sales exceed twelve thousand and one dollars ($12,001), or

(b)     a weekly minimum royalty of three hundred dollars ($300) during the first year after the Start Date, four hundred fifty dollars ($450) during the second year after the Start Date, and six hundred dollars ($600) during the third and later years after the Start Date.

We may increase the weekly minimum royalty each year in an amount corresponding to the increase in the CPI for the immediately preceding year. You must submit a statement of Gross Revenue on the form we designate with each royalty payment.

## 6.4. Marketing Fund Contributions

On Wednesday of each week, or on any other day that we designate in writing, you will pay us a monthly royalty of three percent (3%) of Gross Revenue, as "Gross Revenue" is defined in Article 3 of this agreement, or a weekly minimum marketing fund contribution, whichever is more, based upon Gross Revenue in the immediately preceding calendar week ending at close of business for the week. The weekly minimum marketing fund contribution is one hundred forty dollars ($140). We have the right to increase the weekly minimum marketing fund contribution each year in an amount corresponding to the increase in the CPI for the immediately preceding year.

W:\WDOX\CLIENTS\SCL\001\00076881.WPD
Franchise Agreement
Issued March 1, 2014
Revised May 15, 2014

## 6.5. Technology Fee

You must pay us a monthly Technology Fee to compensate us for our cost to maintain your separate page or pages on our web sites (up to one (1) hour of work on your web page per month), maintain our toll free promotional telephone numbers, and pay for our web-based customized contact management and scheduling application. Currently, the fee is one hundred dollars ($100) a month. The fee may increase to reflect increases in our costs.

## 6.6. On-line Lead Generation Deposit

You must establish and maintain a deposit with us from which we can pay for third party on-line lead generation services that benefit you individually, such as pay-per-click advertising. Initially, the deposit will be based on your anticipated monthly expenditure for this purpose, as discussed and agreed between us. We will adjust the deposit upward or downward from time to time to reflect your desired lead-generation budget. We may keep this deposit in the same bank account with our general funds but we will account for it separately on the general ledger. If your lead generation expense exceeds the amount on deposit in any month, we may take payment of the excess from your bank account, as described in § 6.7 of this agreement, upon ten  (10) days' notice to you.

## 6.7. Payment of Ongoing Fees

Your obligation to pay ongoing weekly royalties and marketing fund contributions and monthly Technology Fees and to establish your lead-generation deposit begins on the Start Date of this agreement. If the Start Date is on any day other than the first day of a week, we will prorate the minimum royalties and minimum marketing fund contributions and the Technology Fee based on the number of days from the Start Date to the last day of the first payment period under this agreement.

You must sign the attached authorization agreement for prearranged payment, in the form of Attachment 3 to this agreement, or any other document necessary to enable us to initiate payment of royalties and marketing fund contributions by electronic funds transfer, pre-arranged draft, credit card payment, or any other technology that we specify, at our option. If we are unable to take payment by the means we elect because you have not submitted a statement of Gross Revenue or for any other reason for which you are responsible, our inability to take payment will be considered your failure to make payment.

## 6.8. Audit

We have the right to audit your books and records, including your tax returns and financial and business data, including email and documents relating to evaluations, assessments, estimates, jobs and client relations, from fixed and removable drives of your business computer system, with respect to your Service during normal working hours with no advance notice. We may, at our option, require that you send copies of documents and digital records to us for audit at our location rather at your location. The auditor may be our employee or an independent contractor and does not have to be an accountant. If an audit shows an underpayment of royalties or marketing fund contributions payable under this agreement, you must immediately pay these amounts to us with accrued interest on the amount underpaid as provided in this Article. If you are unable to produce the records we

-10-

require you to maintain to explain any discrepancy disclosed by the audit, we will presume that the discrepancy resulted from an underpayment.

If we performed the audit because you did not provide required financial statements at the times and in the format specified in the Manual or if the underpayment exceeds three percent (3%) of the total royalty or marketing fund contribution payable for any period covered by the audit, you must also reimburse us for our expenses for the audit.

If you dispute our finding of an underpayment, we will retain, at your written request within ten (10) days of receiving our notification of underpayment, a certified public accountant to review or audit, at your option, your books and records for the period under examination. If the certified public accountant's report shows an underpayment that equals or exceeds any underpayment we found, you must reimburse us for our expenses in obtaining both audits, the amount of the underpayment and interest on past due amounts.

## 6.9. Training Fees and Costs

We do not charge a fee for the initial training program for any of your management team attending simultaneously. If we must repeat the program for an additional member of your management team, we may charge a training fee for the new employee's training. We may also charge a training fee for optional continuing education programs. For all training we offer, you must pay any costs of travel, lodging, meals, and other incidental expenses that you or your employees incur or that we incur in traveling to your location to train a new managerial employee, including a reasonable *per diem* for any trainer who travels to your location.

## 6.10. Renewal Fee

As a condition of renewing this franchise, you must pay, when you sign the franchise agreement for the first renewal term, a renewal fee equal to twenty percent (20%) of the amount of the initial franchise fee we currently charge at the time of renewal. Any renewal fee for a later renewal term will be set in the franchise agreement for the expiring franchise term.

## 6.11. Transfer Fee

As a condition of Transfer of this franchise, you must pay, before the Transfer, a transfer fee of five thousand dollars ($5,000).

## 6.12. Annual Meeting Registration Fee

We will charge a registration fee of up to five hundred dollars ($500) for each person attending the STERI-CLEAN® Annual Meeting. Payment is due at least one (1) month before the meeting begins.

## 6.13. Declined Payment Charge

You must immediately upon demand pay us a declined payment charge of thirty-five dollars ($35) or our actual expense, whichever is more, to compensate us for the administrative expenses and bank charges we incur if your credit card payment is declined or the bank dishonors your check or electronic payment.

W:\WDOX\CLIENTS\SCL\001\00076881.WPD
Franchise Agreement
Issued March 1, 2014
Revised May 15, 2014

### 6.14. Administrative Processing Fee for Late Payment or Report

You must pay us, upon invoice, an administrative processing fee of fifty dollars ($50) for each late payment or report. The purpose of the late payment or report charge is to compensate us for the administrative burden imposed upon us by your failure to comply with your obligation on time.

### 6.15. Interest on Late Payments

Any payment that we do not receive from you when due will bear interest at one and a half percent (1.5%) per month or at the highest rate allowed by applicable law on the date when payment is due, whichever is less. We charge interest on late payments to partially compensate us for loss of use of the funds that would otherwise be difficult to measure precisely. The fact that we impose these charges is not a waiver of our right to be paid on time.

### 6.16. Application of Payments

We may apply any payment you make to us, at our option, to any past due debt you owe us despite how you say we should apply the payment. We do not have to accept payments after they are due or extend credit or otherwise finance your operations, except as specifically provided in this agreement. If you do not pay all amounts when due, we may suspend our services and support until you cure the failure. If you do not make the payment within any applicable cure period, we have the right, at our option, to terminate this agreement.

**THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK**

W:\WDOX\CLIENTS\SCI\001\00076881.WPD
Franchise Agreement
Issued March 1, 2014
Revised May 15, 2014

# 7. YOUR OBLIGATIONS

## 7.1. Use of Trade Name and Marks

### 7.1.1. Context

You may use the Trade Name and Marks only in the operation of a STERI-CLEAN® Service and in the manner specified in the Manual. You must obtain our prior written consent to any new use of the Trade Name and/or Marks. You may not use any other trade name or marks in connection with your Service. You must sign an Assignment of Telephone Numbers, Email Addresses and Website Addresses, in the form of Attachment 5, to this agreement when you sign this agreement.

### 7.1.2. Changes in Trade Name and Marks

We have the right to change our Trade Name and Marks and the specifications for each when we believe, in our reasonable discretion, that the changes will benefit the Franchise Network. You must promptly conform, at your own expense, to any such changes.

### 7.1.3. Advertising Materials

All advertising and promotion that you undertake must be completely truthful, conform to the highest standard of ethical advertising and comply with any applicable laws and regulations. You must submit to us copies of all promotional and advertising materials that you propose to use at least two weeks before the proof approval deadline. We will review the materials within a reasonable time and will promptly notify you whether we approve or reject them. We may not withhold our approval unreasonably. Even if we approve specified materials, we may later withdraw our approval if we reasonably believe it is necessary to make the advertising conform to changes in the System or to correct unacceptable features of the advertising.

### 7.1.4. Legal Protection

You must notify us immediately in writing if you become aware of any unauthorized use of our Trade Name, Marks, or System. You must promptly notify us in writing of any claim, demand, or suit against you or against your principals concerning your use of the Trade Name, Marks, or System. In any action or proceeding arising from or concerning any such claim, demand, or suit, we may select legal counsel and have the right to control the proceedings.

## 7.2. Quality Assurance

### 7.2.1. Warehouse Location and Pre-Opening Development

You must locate, secure and develop the Location where your Service's warehouse is based. You must obtain our prior written approval of your Location. Your Location must be within your Territory. The premises and the area must provide a safe, clean environment for your employees and must be consistent with the STERI-CLEAN®

W:\WDOX\CLIENTS\SCL\001\00076881.WPD
Franchise Agreement
Issued March 1, 2014
Revised May 15, 2014

image. You must obtain our prior written approval of your Location before signing your lease and any renewals of your lease by submitting to us photographs and providing any information we may request about the site and neighborhood.

You must build out and furnish the Location in a timely manner in relation to the Start Date. You must have two (2) white unmarked work vans, at least one of which must be a box van, by the Start Date.

### 7.2.2. Initial Training Program

You or your Designated Owner must attend and successfully complete all phases of the initial training program and complete it to our satisfaction. Your Service must always be supervised by you or a person with a controlling interest in you who has successfully completed our initial training program and who is certified by us in writing to act as Designated Owner. Failure to successfully complete any aspect of the training program, as we determine in our reasonable discretion, constitutes grounds for immediate termination of your franchise.

### 7.2.3. Attendance at Additional Training

If we advise you that attendance at an additional training program is mandatory, you must attend and complete the program, at your own expense, to our reasonable satisfaction. We will not charge a fee for mandatory additional training.

### 7.2.4. Opening

You may not open your Service to the public until we certify in writing that, in the view of our management, you and your employees are prepared to begin operation. **By certifying that our management believes your Service is prepared to open, we do not guarantee that your Service will be successful.** Success is dependent on many factors that are not within our control.

### 7.2.5. Compliance with Manual

You must operate your Service in total compliance with the standards and specifications stated in the Manual. We may make changes in our standards and specifications, when, in our reasonable discretion, change is needed for the continued success and development of the Franchise Network. Such changes may require the purchase of equipment, supplies, furnishings or other goods, completion of additional training by your employees, or other cost to you. You must promptly conform to the modified standards and specifications at your own expense. You must at all times keep your copy of the Manual current by inserting in it any revised pages we give you and deleting superseded pages. If there is any dispute as to the requirements of the Manual at any point in time, the terms of our master copy of the Manual will control.

### 7.2.6. Services Offered and Products Used

You must sell all the services and only the services that we have authorized you to provide. Authorized services include cleaning sites subject to accumulated possessions, refuse, contamination and damage associated with hoarding, trauma, death, tear gas, human and animal bodily fluids and waste, and other biohazards. If, from time to time, we

-14-

decide to make changes in the services you are authorized to provide, you must comply at your own expense with the changed requirements.

If we designate a particular supplier as the sole source for goods or services you use or sell in your Service, you may buy only from that supplier. You must replenish your marketing materials through us or our designated supplier. If we develop Proprietary Products for use in cleaning, you must buy them exclusively from us or our designated supplier.

You must accept the credit cards and use the credit card provider, if any, that we designate. You must participate in any gift card program that we establish according to the terms of the program.

You must use any software and/or hardware that we specify and must update your computer system to maintain compatibility with our requirements. If instructed to do so, you must subscribe to and use any web-based application that we designate at your own expense. If we develop Proprietary Products for use or sale in your Service, you must use them as prescribed. You may purchase Proprietary Products only from us or our designated supplier. You may not use any substitute for Proprietary Products without our prior written consent, which we may withhold in our sole discretion.

You may not target clients outside your Territory in your marketing or advertising efforts and you may not provide service outside your Territory unless we ask you to do so. If we ask you to provide service outside your Territory, our request applies only to the single instance and does not give you the right to continue providing service within an expanded area.

### 7.2.7. Client Satisfaction Program

We may use various techniques to obtain client feedback concerning your services. If the feedback indicates that your performance does not meet our currently effective standards, as described in the Manual, or if we receive unusual numbers of client complaints about your Service, we may suggest ways in which you can improve your performance. If you do not take immediate, effective steps to bring your operation up to our standards, your failure to do so will be a material breach of this agreement. If you are unable to resolve each customer complaint on your own, you must use any third party ombudsman service that we specify at your own expense.

### 7.2.8. Maintenance and Upgrades

You agree to keep your Service premises, equipment and furnishings clean and in excellent repair. Periodically, we will ask you to upgrade the equipment and furnishings to meet our currently effective standards. You must promptly comply with any such request.

### 7.2.9. Professional Conduct

In all your dealings with us, your clients, your employees, your suppliers and others, you must adhere to the highest possible standards of professional conduct, courtesy, honesty, integrity, ethical behavior, dependability, good faith and fair dealing. You may not engage in any conduct that, in our reasonable opinion, may injure the goodwill

W:\WDOX\CLIENTS\SCL\001\00076881.WPD
Franchise Agreement
Issued March 1, 2014
Revised May 15, 2014

associated with the Trade Name and Marks. You must do everything you can to promote and maintain the excellent reputation of the STERI-CLEAN® Franchise Network. Breach of this clause is a breach of this agreement and, if material, is grounds for immediate termination without opportunity to cure.

### 7.2.10. Observation

We will conduct periodic quality assurance observation of operations in your Service during normal business hours. You will cooperate with our representatives during inspections. We may conduct quality assurance observation with or without prior notice. You must promptly correct any deficiencies in your operation of which we advise you. If you do not take immediate, effective steps to bring your operation up to our standards, your failure to do so will be a material breach of this agreement.

### 7.2.11. Notification of Complaints

You must notify us promptly if you are served with a complaint in any legal or administrative proceeding that is in any way related to your Service or if you become aware that you are the subject of any complaint to or investigation by a governmental licensing authority or consumer protection agency.

## 7.3. Attendance at Annual Meeting

We may, at our sole discretion, arrange an Annual Meeting to provide updates, offer continuing education, and encourage discussion of topics of importance to the Franchise Network. If we designate attendance at the Annual Meeting as mandatory, your Designated Owner must attend at your own expense.

## 7.4. Personnel

### 7.4.1. Management

Your Designated Owner (the person whom you have appointed and we have certified as the person who has day-to-day control of your Service and overall responsibility for its operation) must devote full time and best efforts to the management and operation of your Service and must supervise all its financial and operational aspects. We are entitled to address all communications with you to your Designated Owner and your Designated Owner may make agreements with us on your behalf. You must keep us informed of the identity of your Designated Owner. If we, in our reasonable discretion, determine that a Designated Owner is not properly performing his or her duties, we will advise you and you must immediately take steps to correct the situation.

If you Transfer a controlling interest in your franchise, the transferee or its principal owner must successfully complete the training program and obtain our certification as the Designated Owner at your expense, as well as meeting our other requirements for Transfer listed in Article 9 of this agreement.

### 7.4.2. Employees

You must always employ a sufficient number of properly trained and qualified employees to operate your Service according to our standards. You must see that your

-16-

employees preserve excellent clients relations, conform to our dress code, and otherwise comply with this agreement and the Manual.

## 7.5. Advertising Obligations

### 7.5.1. Grand Opening

You must conduct a grand opening advertising program conducted according to the general guidelines in the Manual for an initial advertising program. You must spend at least three thousand dollars ($3,000) per month on the program in each of the first three (3) months after opening for business under the franchise agreement.

### 7.5.2. Local Advertising

You must regularly conduct local advertising and promotion in a manner that conforms with the Manual and spend at least two percent (2%) of your monthly Gross Revenue for this purpose. Some or all of this expenditure must be devoted to on-line lead generation, as explained in the Manual, and will be paid from the deposit you maintain with us for this purpose. As to any excess, you must submit, on or before the fifteenth (15th) day of each calendar quarter, copies of invoices for advertising materials, public relations activities, and/or media space and time showing that you have complied with the provisions of this paragraph during the immediately preceding quarter. We will credit the money you spend for online lead generation and any regional advertising cooperative contributions that you make, if you choose to join an advertising cooperative, toward your local advertising obligation.

### 7.5.3. Signs

Subject to applicable law and your landlord's consent, if required, you must permanently display, at your own expense, at your business premises and on all vehicles you use in the Service, signs of any nature, form, color, number, location and size, and containing any legends that we have designated in writing.

## 7.6. Financial Information

### 7.6.1. Records

We have the right to access and copy the data on your computer system upon reasonable advance notice. You must keep financial records of your business in the form prescribed by the Manual for at least three (3) years.

### 7.6.2. Reports

You must submit to us financial reports on the income and expenses of your Service at the times and in the format specified in the Manual. You must submit to us monthly reports on the number of estimates you provide and the number of jobs you are awarded. We will require you to buy or lease computer and communications equipment and software that meet specifications stated in the Manual to create reports, transmit them to us electronically, receive e-mail communications and enable you to participate in our intranet.

W:\WDOX\CLIENTS\SCL\001\00076881.WPD
Franchise Agreement
Issued March 1, 2014
Revised May 15, 2014

You must submit to us, upon request, copies of all federal, state, and local income, sales, and property tax returns related to your Service. We may use this data to confirm that you are complying with your obligations under this agreement, to formulate earnings and expense information to show to prospective franchisees and to advise you on Service operations.

## 7.7. Participation in Major Accounts Program

You may, at your option, participate in our Major Accounts Program. If you elect to participate, you must follow the procedures prescribed in the Manual from time to time in all your dealings with actual or prospective Major Account clients. You must either honor the prices we quote to Major Account clients or cooperate with us in arranging for other members of the Franchise Network to provide service to those clients regardless of the fact that the clients are located in your Territory.

## 7.8. Insurance

You must purchase and maintain a policy or policies of comprehensive public liability insurance, including products liability coverage, covering all Service assets, personnel, and activities on an occurrence basis with a combined single limit for bodily injury, death, or property damage of not less than one million dollars ($1,000,000). We may increase the minimum coverage requirement annually to reflect inflation or other changes in circumstances. You must also carry (1) casualty insurance in a minimum amount equal to the replacement value of your interest in your Service premises, including furniture, fixtures, and equipment, and (2) business interruption insurance in an amount sufficient to cover the rent of your Service premises, salary, or wages of key personnel, and other fixed expenses. Each of these insurance policies must contain a provision that the policy cannot be canceled or amended without thirty (30) days' written notice to us. It must be issued by an insurance company with a rating of at least "AXII" by A.M. Best & Co., designate us as an additional named insured and be satisfactory to us in form, substance, and coverage. You must deliver a certificate of the issuing insurance company evidencing each policy to us as soon as the policy is issued, modified, or renewed in any manner we specify in the Manual.

In addition, you must maintain policies of workers' compensation insurance, unemployment, disability insurance, and any other types of insurance required by applicable law.

## 7.9. Financial and Legal Responsibility

### 7.9.1. Compliance with Law

You must comply with all federal, state, and local laws and regulations pertaining, directly or indirectly, to your Service. You must strictly follow all laws and regulations relating to unemployment insurance, workers' compensation insurance, payment of wages and/or salaries and withholding and payment of payroll taxes. You must keep current all licenses, permits, bonds, and deposits made to or required by any government agency in connection with your operation of your Service.

W:\WDOX\CLIENTS\SCL\001\00076881.WPD
Franchise Agreement
Issued March 1, 2014
Revised May 15, 2014

### 7.9.2. Payment of Indebtedness

You must pay promptly when due all taxes and debts that you incur in the conduct of your business, particularly debts to your landlord and approved or designated suppliers. You must remain current in any financial responsibilities to your lessor and to us or our affiliates.

## 8. RELATIONSHIP OF PARTIES

### 8.1. Interest in Marks and System

You may not at any time do or cause to be done anything contesting or impairing our interest in our Trade Name, Marks or System or causing harm to the goodwill associated with the Trade Name and Marks. You are not granted any rights in our Trade Name, Marks or System except for your right to use them according to the express terms of this agreement. We retain the right to grant other franchises or licenses to use the Trade Name, Marks, and System on any terms that we would like, subject only to your rights described in Article 4 of this agreement.

### 8.2. Independent Status

You are an independent contractor and must make this fact clear in your dealings with suppliers, lessors, government agencies, employees, clients, and others. You must rely on your own knowledge and judgment in making business decisions, subject only to the requirements of this agreement and the Manual. You may not expressly or implicitly hold yourself out as our employee, partner, member, shareholder, joint venturer, or representative, nor may you state or suggest that you have the right or power to bind us or to incur any liability on our behalf. You may not use any part of the STERI-CLEAN® Trade Name as part of your legal name (corporate, limited liability company, or partnership name), although you may use the Trade Name as described in the Manual as part of your fictitious business name.

### 8.3. Display of Statement

You must conspicuously display a sign that says that "THIS STERI-CLEAN® SERVICE IS AN INDEPENDENTLY OPERATED FRANCHISED BUSINESS OWNED BY _____ [your full legal name]" at the Location. Business cards, stationery, purchase order forms, invoices, leases, tax returns, and other documents you use in your business dealings with suppliers, lessors, government agencies, employees, and clients must clearly state that you are independently owned and operated under a STERI-CLEAN® franchise.

### 8.4. Confidentiality

The information, ideas, forms, marketing plans, and other materials we disclose to you under this agreement, whether or not included in the Manual, are our confidential and proprietary information and trade secrets. You agree to maintain the confidentiality of all such material. You may not disclose any such information to any third party, except to your employees and agents as necessary in the operation of your Service and except as we authorize in writing. It is your responsibility to obtain compliance of your Related Parties

-19-

with the provisions of this section. Each of your Related Parties must sign a written nondisclosure agreement, in the form of Attachment 4 to this agreement, when you sign this agreement. You must obtain a nondisclosure agreement from each new Related Party with whom you become affiliated during the term of this agreement and promptly send a copy of the nondisclosure agreement to us.

## 8.5. Indemnification

You must indemnify and hold us harmless from all expenses and liabilities of any kind arising from or in any way connected to any act or omission of yours other than the operation of your Business in strict compliance with this agreement. If we are made a party to a legal proceeding in connection with your act or omission, we may hire counsel to protect our interests and bill you for all expenses and fees we incur. You must promptly reimburse us.

We must indemnify and hold you harmless from all expenses and liabilities of any kind arising from or in any way connected to any third party claim that your operation of a STERI-CLEAN® Service infringes its intellectual property rights or misappropriates its trade secrets. If you are made a party to a legal proceeding in connection with a claim of this type, we will hire counsel to protect our interests and will defend you at our own expense. Any settlement we negotiate will bind you, but we will reimburse you for your direct cost of compliance with the settlement agreement.

## 8.6. Covenant Not to Compete

You may not, during the term of this agreement and for one (1) year after its Termination, operate or own a beneficial interest in any cleaning company, restoration company or other service company promoting or featuring hoarding or biohazard cleanup, other than a STERI-CLEAN® Service, that is located within fifty (50) miles of a STERI-CLEAN® Service's Territory or your former Territory. You agree to obtain the individual written agreement of each of your Related Parties to the provisions of this section in the form of Attachment 4 to this agreement.

## 8.7. Non-Solicitation of Employees

During the term of this agreement and for one (1) year after its Termination, you may not disrupt, damage, impair, or interfere with our business or that of any of our franchisees by directly or indirectly soliciting their employees to work for you or for any individual or company then in competition with the Franchise Network.

## 9. TRANSFER OF FRANCHISE

## 9.1. Purpose of Conditions for Approval of Transfer

We grant this franchise in reliance on your integrity, ability, experience, and financial resources. You may sell neither the franchise nor your Service operated under it unless you have first obtained our written consent, which may not be unreasonably withheld. To ensure that no Transfer jeopardizes the Trade Name, Marks, or our interest

-20-

in the successful operation of your Service, we will consent to a Transfer only if you comply with the provisions of Sections 9.2 through 9.4 of this agreement.

### 9.2. Notice of Intention to Transfer

If you would like to transfer this franchise, you must submit to us: (a) the form of franchise purchase application we currently use, completed by the prospective transferee and (b) a written notice, describing all the terms and conditions of the proposed Transfer or a copy of the purchase and sale agreement, and (c) the transfer fee described in Section 6.11 of this agreement.

### 9.3. Consent and Right of First Refusal

We must respond in writing to your written notice within fifteen (15) days after receiving it, or, if we request additional information, within the later date of fifteen (15) days after receipt of the additional information or the final day of the original fifteen- (15-) day period. We may either approve the Transfer, state in writing our reason for refusing to approve it, or purchase your Service from you ourselves on the same terms and conditions as those offered by the third party. Silence is not approval. If we approve the Transfer, then you may transfer the interest described in the notice only to the named transferee and only on the terms and conditions stated in the notice. Our final consent to the Transfer must be obtained in writing after all the conditions stated below have been fulfilled. Our consent to a particular Transfer will not be consent to any other or subsequent Transfer.

### 9.4. Conditions for Consent to Transfer

Our consent to your Transfer will not be unreasonably withheld, but will be subject to certain conditions, including, but not limited to:

(a) Our determination, based on the information that you submit and any other information available, that the proposed transferee is qualified by meeting all of the criteria of character, business experience, financial responsibility, net worth, and other standards that we customarily apply to new franchisees at the time of Transfer,

(b) Payment of all your outstanding debts to us and our affiliates,

(c) Cure of all defaults under the franchise agreement, any other agreement(s) between us and you or your Related Parties, and the Manual,

(d) At our sole option, signing by the transferee of an assumption of the rights and obligations of this franchise agreement or signing by the transferee of the then-current form of franchise agreement, and signing by the transferee's Related Parties of required supplemental agreements in the forms attached to the applicable franchise agreement,

(e) Completion by the transferee's Designated Owner of our initial training program to our satisfaction,

W:\WDOX\CLIENTS\SCL\001\00076881.WPD
Franchise Agreement
Issued March 1, 2014
Revised May 15, 2014

(f)     Signing by you and your Related Parties of a special release of claims against us and our affiliates in the form of Attachment 2 of this agreement,

(g)     Our determination, based on our review of the proposed purchase agreement or notice, that the agreement and any financing of the sale will give the buyer a reasonable chance to succeed as our franchisee,

(h)     Your opening an escrow for the franchise Transfer to ensure fulfillment of the conditions for Transfer listed above, and

(i)     Your payment of the transfer fee described in Section 6.11 of this agreement.

## 9.5. Assignments Not Treated as Transfers

The Transfer provisions described above do not apply to an assignment to:

(a)     Any Trustee, Guardian, Executor, or Conservator for the account and benefit of a spouse, ancestor, or descendent;

(b)     Any of your employees under any employee stock option plan or stock purchase plan, if any share certificate distributed in connection with a plan of this type is marked with a legend describing the restrictions and conditions of Transfer required by this agreement;

(c)     Any business entity if the controlling interest in the franchisee immediately after the assignment is the same and in the same proportions as the controlling interest immediately before the assignment. We will consent to an assignment of this type only if you fulfill all of the following conditions:

   (i)     You promptly advise us in writing of the assignment and send us a copy of the assignee's organizational documents and a list of names of the assignee's owners together with a statement of percentage of ownership;

   (ii)    You sign a guarantee, in the form attached as Attachment 6, of the obligations of the assignee; and

   (iii)   You sign our currently effective form of franchise agreement at the time of assignment.

## 9.6. Change of Ownership Upon Death or Total Disability

If you or your principal owner dies or becomes totally disabled while this agreement is in effect, your heirs, successors or beneficiaries will have sixty (60) days within which to show to our satisfaction that they meet all of the criteria of character, business experience, financial responsibility, net worth, and other standards that we require of new franchisees at that time. If we approve your heirs, successors or beneficiaries as transferees of the franchise, we will waive any transfer fee in connection with the Transfer. If we advise your heirs or beneficiaries in writing that we do not approve them as transferees of the franchise, or if we do not approve or disapprove a Transfer within sixty (60) days following your death or total disability, your heirs or beneficiaries may have one hundred twenty (120) additional days from the date of disapproval of the Transfer

-22-

or the end of the sixty- (60-) day period, whichever is first, within which to find and notify us of a proposed Transfer to a qualified transferee. If your heirs or beneficiaries do not advise us of a qualified transferee within the specified period, the franchise will automatically terminate at the end of that period unless we have granted a written extension of time.

### 9.7. Assignment by SCI

We may assign this agreement or any rights or obligations created by it without your consent upon the following conditions: (a) we reasonably believe that the assignee can perform our obligations under this agreement, (b) we reasonably believe the assignee is financially responsible, and (c) the assignee expressly agrees in writing to assume our obligations under this agreement.

## 10. TERMINATION OF FRANCHISE

### 10.1. Termination by Consent of the Parties

The parties may terminate this agreement by mutual written consent.

### 10.2. Termination by SCI

#### 10.2.1. Notice of Default

This Agreement will terminate ninety (90) days after we give you written notice if the default described in subsection (a) below has not been cured. This Agreement will terminate thirty (30) days after written notice of default is given to you if any of the defaults described in subsections (b) through (d) below has not been cured. This Agreement will terminate five (5) days after we give you written notice if the default described in subsection (e) below has not been cured. This Agreement will terminate immediately when we give you written notice if any of the defaults described in subsections (f) through (q) below occurs.

#### 10.2.2. Events of Default

Subject to the notice provisions in the preceding section, on the occurrence of any of the following defaults, at our option we may terminate this agreement:

(a)     If, beginning with the ninth (9th) full calendar quarter of this agreement, you fail, during the following calendar quarter, to cure a failure to meet the Minimum Performance Standard during any calendar quarter, or if we have given you written notice that you failed to meet the Minimum Performance Standard three (3) times during eight (8) consecutive calendar quarters,

(b)     If you do not submit to us in a timely manner any information or report we require you to submit under this agreement or the Manual, or if you do not deliver to us, in a timely manner, evidence of each insurance policy required by this agreement whenever the policy is issued, amended or renewed,

-23-

(c)     If you do not begin operation of Service by the Start Date of this agreement or if you operate your Service in a manner that does not conform to this agreement and the Manual in any material respect,

(d)     If you default in the performance of any material obligation under this agreement not otherwise described in this list of defaults,

(e)     If you do not make any payment when due under this agreement or any other agreement between you and us or our affiliate,

(f)     If your Designated Owner does not successfully complete the initial training program and we conclude, in our reasonable discretion, that the Owner is unable or unwilling to do so,

(g)     If you intentionally or recklessly misuse the Trade Name, Marks or the System or engage in conduct that reflects materially and unfavorably on the goodwill associated with them, or if you use in your Service any names, marks, systems, logotypes, or symbols that we have not authorized you to use,

(h)     If you or any of your Related Parties has any direct or indirect interest in the ownership or operation of any business that is confusingly similar to a Service or that uses the System or the Marks without authorization from us, or if you do not give us a signed copy of the Nondisclosure and Noncompetition Agreement of each of your Related Parties within ten (10) days after that party becomes a Related Party,

(i)     If you or your Related Party attempt to assign your rights under this agreement or to transfer your Service in any manner not authorized by this agreement,

(j)     If you or your Related Party has made any material misrepresentation in connection with the acquisition of a Service or to induce us to enter into this agreement, or if you knowingly keep false books or intentionally make false royalty reports or make any other material misrepresentation to us in the operation of your Service,

(k)     If any other agreement between you or your Related Party and us or our affiliate is terminated because of your material default,

(l)     If you act without our prior written approval or consent in regard to a matter for which this agreement expressly requires our prior written approval or consent,

(m)     If you stop operating your Service under circumstances that lead us to the reasonable conclusion that you do not intend to resume operation or if you close your Service for a consecutive period of four (4) days or more, except for a period of not more than one hundred twenty (120) days because of an event that was not within your reasonable control,

(n)     If you commit a material default and we have twice previously given you written notice of the same type of default within the preceding twelve (12) months, whether or not you have cured the defaults,

-24-

(o)     If we reasonably determine that the continued operation of your Service will pose a threat to public health or safety, or if you fail to maintain any legally required certifications, licenses or bonds,

(p)     If you become insolvent, or

(q)     If you are convicted of criminal misconduct that is relevant to the operation of your Service or any felony.

### 10.3. Rights and Obligations After Termination

On Termination of this agreement for any reason, the parties will have the following rights and obligations:

(a)     We may stop performing our obligations under this agreement.

(b)     You must give us a final accounting for your Service, pay us within thirty (30) days after Termination all payments due to us, and return the Manual, marketing materials, proprietary forms, software, videotapes and any other property belonging to us or our affiliate or containing proprietary information.

(c)     On our written request, you must immediately and permanently stop using the Marks or any confusingly similar marks, the System, and any advertising, signs, stationery, or forms that bear identifying marks or colors that might give others the impression that you are operating a Service.

(d)     You must promptly sign any documents and take any steps that in our judgment are necessary to delete your listings from classified telephone directories, disconnect or, at our option, assign to us any telephone numbers that have been used in connection with your Service, and terminate all other references that suggest you are or ever were associated with us. By signing this agreement, you irrevocably appoint us your attorney-in-fact to take the actions described in this paragraph if you do not do so yourself within seven (7) days after this agreement is terminated.

(e)     You must maintain all records we require you to maintain under this agreement for not less than three (3) years after final payment of any money you owe to us when this agreement is terminated.

(f)     For thirty (30) days after Termination, we have the right, at our sole option, to acquire the exclusive right to the lists of your clients and prospective clients during the twelve- (12-) month period before Termination, together with their contact information, by paying five dollars ($5) per client and two dollars and fifty cents ($2.50) per prospective client. You must give us updated digital copies of the lists. We may offset any amounts you owe us or that we must pay to cure your defaults with vendors or resolve your disputes with clients against the purchase price you receive for the lists. We may exercise this option by giving you written notice within the option period. You must immediately tender the lists. We must pay you promptly when you provide the lists.

-25-

(g)    If the franchise granted in this agreement is terminated because of either party's material default, the rights described in this section may not necessarily be the injured party's exclusive remedies, but will instead supplement any other equitable or legal remedies available. If this agreement is terminated because of either party's material default, the other party has the right to recover damages as compensation for lost future profits.

(h)    Termination of this agreement will not end any obligation of either party that existed before Termination. All obligations of the parties that by their terms or by reasonable implication are to be performed in whole or in part after Termination will survive Termination.

## 11. MISCELLANEOUS PROVISIONS

### 11.1. Construction of Contract

Section headings in this agreement are for reference purposes only and will not in any way modify the statements contained in any section of this agreement. Each word in this agreement may be considered to include any number or gender that the context requires. If there is any conflict between this agreement and the Manual, this agreement will control.

### 11.2. Governing Law

This agreement will be governed by and interpreted under the laws of your State, with the exceptions that arbitration proceedings and trademark rights will be exclusively governed by and interpreted under federal law.

### 11.3. Notices

The parties to this agreement should direct any notices to the other party at the address below that party's name on the final page of this agreement or at another address if advised in writing that the address has been changed. Notice may be delivered by facsimile (with simultaneous mailing of a copy by first class mail), email (with simultaneous mailing of a copy by first class mail), delivery service or first class mail. Notice by facsimile or email will be considered delivered upon transmission, by delivery service, upon delivery or attempted delivery, and by first class mail, three days after posting. Notice of Termination or nonrenewal must be sent by a receipted form of delivery or personally delivered, but will be effective upon attempted delivery even if delivery is not accepted.

### 11.4. Amendments

This Agreement may be amended only by a document signed by all of the parties to this agreement or by their authorized agents.

### 11.5. Waiver

Waiver of any breach of this agreement is not a waiver of any other or subsequent breach.

-26-

### 11.6. Integration

This agreement and any exhibits or attachments to it are the entire agreement between the parties concerning the franchise it grants. All other agreements and representations, other than the representations in the franchise disclosure document, are superseded by it. Nothing in this agreement or any related agreement disclaims the representations made in the franchise disclosure document.

### 11.7. Negotiation and Mediation

#### 11.7.1. Agreement to Use Procedure

The parties have reached this agreement in good faith and in the belief that it is mutually advantageous to them. In the same spirit of cooperation, they pledge to try to resolve any dispute without litigation or arbitration. They agree that, if any dispute arises between them, before beginning any legal action or arbitration to interpret or enforce this agreement, they will first attempt to negotiate a settlement and, if either party files a mediation proceeding, participate in the mediation. Good faith participation in these procedures to the greatest extent reasonably possible is a precondition to maintaining any legal action or arbitration to interpret or enforce this agreement.

#### 11.7.2. Initiation of Procedures

The party that initiates these procedures must give written notice to the other party, describing in general terms the nature of the dispute, specifying the party's claim for relief, and identifying one or more people with authority to settle the dispute for him, her, or it. The party receiving the notice has ten (10) days within which to designate by written notice one or more people with authority to settle the dispute on the responding party's behalf.

#### 11.7.3. Direct Negotiations

The parties may investigate the dispute as they consider appropriate, but agree to meet in person or by prearranged teleconference within fourteen (14) days from the date of the initial notice to discuss resolution of the dispute. Each party agrees to consider the other party's point of view in considering the dispute and to negotiate in good faith, with an open mind to compromise, in a serious effort to finally resolve the dispute.

#### 11.7.4. Mediation

If the dispute has not been resolved within thirty (30) days after the initial notice, either party may, at its option, begin mediation procedures. Mediation will be conducted by and under the rules of the American Arbitration Association ("AAA") in San Bernardino County, California, unless the parties agree otherwise in writing. The mediator must have substantial experience as an attorney representing franchisors or franchisees or both.

### 11.8. Arbitration

Any dispute arising out of or in connection with this agreement must be determined by binding arbitration by the AAA in San Bernardino County, California, under the rules for commercial arbitration of the AAA, as varied by the express provisions of this clause. The arbitrator must have substantial experience as an attorney representing

-27-

franchisors or franchisees or both. This arbitration clause does not deprive either party of any right it may otherwise have to seek interim injunctive relief from a court of competent jurisdiction. There will be no discovery other than an exchange of documents that will be introduced at the hearing, an exchange of lists of witnesses who will testify at the hearing, production of any signed agreements between the parties to the dispute and the taking of one deposition of up to three (3) hours by each party. If proper notice of any hearing has been given, the arbitrator will have full power to take evidence or to perform any other acts necessary to arbitrate the matter in the absence of any party who fails to appear. The arbitrator will have no power to make any award that modifies or suspends any lawful provision of this agreement and must provide a reasoned award. Any award must include interest from the date of any damages incurred for breach of contract and from the date of the award until judgment on the award is paid in full. Judgment on any award may be entered by any court of competent jurisdiction.

### 11.9. Individual Dispute Resolution

Any arbitration or litigation between or among the parties to this agreement and any of their affiliates or Related Parties will be conducted on an individual basis and not on a consolidated or class-wide basis.

### 11.10. Limitation of Actions

Neither party may maintain an arbitration petition or action against the other party unless (a) the party makes reasonable good faith efforts to follow the negotiation and mediation procedures described above, and (b) subject to applicable state law, files an arbitration petition within one (1) year after the party knows or should know the facts on which the arbitration petition is based.

### 11.11. No Attorney Fees

If legal action, including any action on appeal, or arbitration is necessary to enforce the terms and conditions of this agreement, neither party will be permitted to recover attorney fees from the other, unless either party is entitled to recover attorney fees under applicable law if it prevails. In that case, if the opposing party prevails, it has a reciprocal right to recover attorney fees.

### 11.12. Severability

Each provision of this agreement is severable. If any of its provisions is determined to be invalid or in conflict with any existing or future law or regulation, that provision will not impair the operation of the remaining provisions of this agreement. The invalid provisions will be considered not to be a part of this agreement. However, if we decide that the finding of illegality adversely affects the basic consideration for our performance under this agreement, we may, at our option, terminate it.

### 11.13. Approval and Guaranties

If you are a corporation, all officers and shareholders with a ten percent (10%) or greater interest in you, or, if you are a partnership, all your general partners, or, if you are a limited liability company, all your members must approve this agreement, permit you to give us the financial information we require, and agree to the restrictions placed on

-28-

them, including restrictions on the transferability of their interests in the franchise and your Service and limitations on their rights to compete, and sign separately written guaranties of your payments and performance in the form of Attachment 6 to this agreement.

### 11.14. Acceptance by SCI

This Agreement will not be binding on us unless and until it has been signed by our President, Cory Chalmers.

### 11.15. Disclaimer of Representations

WE MAKE NO REPRESENTATIONS OR PROMISES OF ANY KIND EXCEPT THOSE SPECIFICALLY STATED IN THIS AGREEMENT AND THE FRANCHISE DISCLOSURE DOCUMENT THAT HAS BEEN DELIVERED TO YOU. WE DO NOT GUARANTEE THAT YOU WILL SUCCEED IN THE OPERATION OF THE STERI-CLEAN® SERVICE. WE ARE NOT A FIDUCIARY AND ASSUME NO SPECIAL RESPONSIBILITIES BEYOND THE NORMAL RESPONSIBILITIES OF A SELLER IN A BUSINESS TRANSACTION.

**THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK**

W:\WDOX\CLIENTS\SCL\001\00076881.WPD
Franchise Agreement
Issued March 1, 2014
Revised May 15, 2014

IN WITNESS TO THE FOREGOING, the parties have signed this agreement and warrant that their respective signatory whose signature appears below is duly authorized by all necessary and appropriate corporate action to sign this agreement.

FRANCHISOR
STERI-CLEAN, INC.

Date: _1-5-15_

By: _____
Cory Chalmers
President

9785 Crescent Center Drive, Suite 302
Rancho Cucamonga, CA 91730

*Sign here if Franchisee is an individual\* or a married couple:*

FRANCHISEE

Date: _____       _____

                   Print Name:    _____

Date: _____       _____

                   Print Name:    _____

*\*Multiple individuals, other than a married couple, wishing to enter into this agreement must form a company to sign as franchisee in the signature block below.*

*Sign here if Franchisee is a company:*

FRANCHISEE
Company Name:        Dimattina Holdings LLC
                     _____

Date: _1-5-2015_     By: _____

          Print Name:    _THOMAS R DIMATTINA_

               Title:    _MNG_

Franchisee Address:      _2047 THOMAS ST._

                         _Hollywood FL 33020_

-30-

# STATE SPECIFIC ADDENDUM TO STERI-CLEAN® FRANCHISE AGREEMENT

## 1. INTRODUCTION

This Addendum (Addendum) is effective on the same date as the franchise agreement (Agreement) to which it is attached. The parties to the Addendum are the parties to the Agreement. The purpose of this Addendum is to modify certain clauses of the standard Agreement to meet the requirements of regulatory agencies in particular states.

## 2. AGREEMENT

The parties agree as follows:

### 2.1. Illinois

The following provision applies to you if your State is Illinois:

#### 2.1.1. Special Release of Claims

The Agreement says that we may require you to sign a special release of claims, except for non-waivable statutory claims, as a condition of renewal or transfer of your franchise. The release does not apply to any claim arising under the Illinois Franchise Disclosure Act. Any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of the Act or any other law of Illinois is void. There is no such condition, stipulation or provision in the franchise agreement.

#### 2.1.2. Jurisdiction or Venue

Any provision in a franchise agreement that designates jurisdiction or venue in a forum outside of this space is void, except for jurisdiction or venue of disputes that will be arbitrated. The franchise agreement provides that "Any dispute arising out of or in connection with this agreement must be determined by binding arbitration in San Bernardino County, California." Because all disputes under the franchise agreement must be determined by arbitration, the prohibition on provisions specifying out-of-Illinois venues does not apply to any provision in this franchise agreement.

#### 2.1.3. Governing Law

Section 11.2 (Governing Law) of the Agreement is amended to read as follows:

*This agreement will be governed by and interpreted under the laws of Illinois, with the exceptions that arbitration proceedings will be exclusively governed by the United States Arbitration Act (9 U.S.C.A.*

-i-

*§ 2) and trademark matters will be exclusively governed by and interpreted under the Lanham Act (15 USCA Ch. 22).*

## 2.2. Maryland

The following provisions apply to you if you live in Maryland or your business will be located in Maryland:

### 2.2.1. Special Release of Claims

The Agreement says that we may require you to sign a special release of claims as a condition of renewal or transfer of your franchise. The release will not apply to any liability arising under the Maryland Franchise Registration and Disclosure Law.

### 2.2.2. Limitation of Actions

Any claims arising under the Maryland Franchise Registration and Disclosure Law may be brought for three (3) years after the grant of the franchise. Any claims arising under the Maryland Franchise Registration and Disclosure Law must be brought within three (3) years after the grant of the franchise.

## 2.3. Minnesota

The following provisions apply to you if your State is Minnesota:

### 2.3.1. Special Release of Claims

The Agreement says that we may require you to sign a special release of claims, except for non-waivable statutory claims, as a condition of renewal or transfer of your franchise. The release does not apply to any claim arising under Minn. Stats. Chapter 80C.

### 2.3.2. Notice and Cure Periods

The Agreement states the cure periods for various types of defaults that may lead to termination or non-renewal. With respect to franchises governed by Minnesota law, the franchisor will comply with Minn. Stat. Sec. 80C.14, Subds. 3, 4, and 5, which require, except in certain specified cases, that a franchisee be given 90 days' notice of termination (with 60 days to cure) and 180 days' notice of non-renewal of the Agreement.

### 2.3.3. Limitation of Actions

The Agreement says that neither party may maintain any action or proceeding against the other party unless the party files an arbitration petition within one (1) year after the party knows or should know the facts on which the petition is based. In spite of this, any claims arising under Minn. Stats. § 80C may be brought for three (3) years after the cause of action accrues.

### 2.3.4. Arbitration Venue

The Agreement requires binding arbitration of any dispute. The arbitration will occur in a state other than Minnesota, with costs being borne according to the Rules for Commercial Arbitration of the American Arbitration Association. Under Minnesota Statutes § 80C.21 and Minnesota Rule Part 2860.4400J, this section may not in any way invalidate

-ii-

or reduce any of the franchise owner's rights that are listed in Chapter 80C of the Minnesota Statutes.

### 2.3.5. Legal Protection

The following language is added to section 7.1.4 of the Agreement (Legal Protection):

We will protect your right to use the STERI-CLEAN® Marks and Trade Name or will indemnify you against any loss, costs, or expenses arising out of any claim, suit, or demand regarding your use of the Marks or Trade Name.

## 2.4. New York

The following provision applies to you if your State is New York:

### 2.4.1. Special Release of Claims

The Agreement says that we may require you to sign a special release of claims, except for non-waivable statutory claims, as a condition of renewal or transfer of your franchise. The release does not apply to claims arising under Article 33 of the General Business Law of the State of New York.

## 2.5. North Dakota

The following provisions apply to you if your State is North Dakota:

### 2.5.1. Special Release of Claims

The Agreement says that we may require you to sign a special release of claims, except for non-waivable statutory claims, as a condition of renewal or transfer of your franchise. The release does not apply to any claim arising under the North Dakota Franchise Investment Law.

### 2.5.2. Damages for Early Termination

The Agreement provides that if the Agreement is terminated because of your material default or repudiation of the Agreement, we have the right to recover damages as compensation for lost future profits. This requirement is deleted from the Agreement.

### 2.5.3. Arbitration Venue

The Agreement provides that disputes will be arbitrated in California. This requirement is deleted from the Agreement.

### 2.5.4. Limitation of Actions

The Agreement says that neither party may maintain any action or proceeding against the other party unless the party files an arbitration petition within one (1) year after the party knows or should know the facts on which the arbitration is based. Any claims arising under the North Dakota Franchise Investment Law may be brought within the period provided by North Dakota law.

-iii-

### 2.5.5. Covenant Not to Compete

The Agreement says that you may not, during the term of the Agreement and for years after its Termination, operate or own a beneficial interest in any company that is competitive with any Service and that is located within 50 miles of your former Territory or that of any other Service. North Dakota Century Code § 9-06-08 limits our ability to restrict your activity after the Agreement has ended.

## 3. INCORPORATION OF FRANCHISE AGREEMENT

The terms and conditions of the Agreement are incorporated into this Addendum by reference except to the extent that they conflict with the terms and conditions of this Addendum. If there is a conflict, the terms and conditions of this Addendum will govern.

**THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK**

W:\WDOX\CLIENTS\SCL\001\00076881.WPD
State Specific Addendum to Franchise Agreement
Issued March 1, 2014
Revised May 15, 2014

IN WITNESS TO THE FOREGOING, the parties to this Addendum sign and deliver it.

FRANCHISOR
STERI-CLEAN, INC.

Date: 1-5-15

By: _____

Cory Chalmers
President

*Sign here if Franchisee is an individual\* or a married couple:*

FRANCHISEE

Date: _____      _____

Print Name:      _____

Date: _____      _____

Print Name:      _____

*\*Multiple individuals, other than a married couple, wishing to enter into this agreement must form a company to sign as franchisee in the signature block below.*

*Sign here if Franchisee is a company:*

FRANCHISEE

Company Name:      **Dimattina Holdings LLC**

Date: 1-5-2015      By: _____

Print Name:      THOMAS R DIMATTINA

Title:      MNGR

-V-

# CONVERSION ADDENDUM TO STERI-CLEAN® FRANCHISE AGREEMENT

## 1. INTRODUCTION

This Conversion Addendum (Addendum) is made between Steri-Clean, Inc. (SCI, we or us) and N/A _____ [franchisee's legal name] (you) and modifies the STERI-CLEAN® Franchise Agreement (Franchise Agreement) between the same parties to which it is attached. Terms used in this Addendum are defined in Article 3 of the Franchise Agreement. The parties enter into this Addendum in light of the following facts:

A. We have developed a unique branded System for operating a hoarding and biohazard cleanup service. We own certain intellectual property rights, including the trade name and mark, STERI-CLEAN®, that are used to identify and promote the System. We offer franchises for businesses operated under our system and use our intellectual property to provide these businesses with vital marketing assistance.

B. You own and operate a business that currently offers some of the services our franchisees provide. You would like us to provide assistance and support to enable your business to expand and market additional services.

C. In recognition of the time and effort you have spent in building your existing business and our need to maintain uniformity of our System throughout the Franchise Network and to direct business assistance exclusively to our franchisees, the parties enter into the Franchise Agreement subject to the special modifications stated in this addendum.

## 2. TERMS AND CONDITIONS

Accordingly, the parties agree to modify the Franchise Agreement as follows:

### 2.1. Consultation Regarding Designated Suppliers

We expect to leave most selection of suppliers to the reasonable discretion of our franchisees. However, in a few cases, we may designate a particular supplier for use by our franchisees to obtain system-wide price advantages, ensure quality or achieve some other benefit for the Franchise Network. In designating any specific supplier from which you must buy a product or service to be used in your Service, we will consult with you as to your previous experience and preferences regarding suppliers in the area. If, in our reasonable discretion, we determine that your preferred supplier can provide products and services of equivalent quality to those provided by our designated supplier, we will not withhold our consent to your use of your preferred supplier.

### 2.2. Initial Training Program

Section 7.2.2 is amended to read as follows:

-i-

*You or your Designated Owner must attend and successfully complete all phases of the initial training program and complete it to our satisfaction except for those portions of the program which we certify in writing your prior experience and training make unnecessary.*

*Your Service must always be directly or indirectly supervised by you or your controlling owner who is certified by us in writing to act as Designated Owner. Failure to successfully complete any aspect of the training program constitutes grounds for immediate termination of your franchise unless we, in our sole discretion, determine that your prior experience and training make completion of that aspect of the program unnecessary.*

### 3. INCORPORATION OF AGREEMENT

The terms and conditions of the Franchise Agreement are incorporated in this Addendum by reference except to the extent that they conflict with the terms and conditions of this Amendment. If there is such a conflict, the terms and conditions of this Addendum will govern.

**\*\*THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK\*\***

W:\WDOX\CLIENTS\SCL\001\00076881.WPD
Franchise Agreement - Conversion Addendum
Issued March 1, 2014
Revised May 15, 2014

IN WITNESS TO THESE PROVISIONS, the parties to this Addendum have signed and delivered it as of the date of the Franchise Agreement.

FRANCHISOR
STERI-CLEAN, INC.

Date: 1-5-15

By: _____
Cory Chalmers
President

*Sign here if Franchisee is an individual\* or a married couple:*

FRANCHISEE

Date: _____

Print Name: _____

Date: _____

Print Name: _____

*\*Multiple individuals, other than a married couple, wishing to enter into this agreement must form a company to sign as franchisee in the signature block below.*

*Sign here if Franchisee is a company:*

FRANCHISEE
Company Name: Dimattina Holdings LLC

Date: 1-5-2015

By: _____

Print Name: THOMAS R DIMATTINA

Title: MNCR

-iii-

# TERRITORY

The MiamiTerritory consists of the following Counties:

1) Dade
2) Broward
3) Palm Beach
4) Monroe
5) Collier
6) Hendry
7) Lee

Best population data as of 2012 shows approximately 6,705,000 people residing within this territory.

**ATTACHMENT 1**

# SPECIAL RELEASE OF CLAIMS

This Special Release of Claims is signed on _____ [date], at Rancho Cucamonga, California, by _____
[name of releasor], referred to in this Special Release as "Releasor," in favor of Steri-Clean, Inc., referred to in this Special Release as "Releasee."

## RECITALS

This Special Release is made and delivered with reference to the following facts:

A. Releasee and Releasor are parties to a STERI-CLEAN® franchise agreement dated _____ [date] ("Franchise Agreement").

B. Releasor would like to transfer the Franchise Agreement and the franchised business operated under it to a transferee described in the accompanying documents

--OR--

B. Releasor would like to renew the Franchise Agreement.

C. Releasee is willing to consent to Releasor's request on condition that Releasor meets the conditions for consent stated in the Franchise Agreement. One of these conditions is that Releasor must sign a special release of claims in favor of Releasee.

D. For the above-described consideration, the value and adequacy of which Releasor acknowledges, Releasor signs and delivers this Special Release.

## RELEASE

1. Releasor, on behalf of Releasor and Releasor's Related Parties, as the term "Related Parties" is defined in the Franchise Agreement, now and forever releases and discharges Steri-Clean, Inc. and its successors, attorneys, insurers, brokers, principals, officers, directors, shareholders, partners, agents, employees, and contractors, from any and all claims, demands, losses, expenses, damages, liabilities, actions, and causes of action of any nature, except non-waivable statutory claims or claims arising from a disclosure document we gave you, that in any manner arise from or relate to the franchise relationship described above.

2. This Special Release extends to and includes any and all claims, liabilities, injuries, damages, and causes of action (except non-waivable statutory claims or claims arising from the representations in the disclosure document you received, that the parties do not presently anticipate, know, or suspect to exist, but that may develop, accrue, or be discovered in the future. RELEASOR EXPRESSLY WAIVES ALL RIGHTS UNDER CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of signing the release, which if known by him must have materially affected his settlement with the debtor." Releasor represents and warrants that Releasor has considered the possibility that claims, liabilities, injuries, damages, and causes of action that Releasor does not presently know or suspect to exist in Releasor's favor may develop, accrue, or be discovered in the future, and that Releasor voluntarily assumes that risk as part of the consideration received for this Special Release.

3. Releasor covenants and agrees that Releasor will not make, assert, or maintain any claim, demand, action, or cause of action that is discharged by this Special Release against any Releasee named or described in this Special Release. Releasor agrees to indemnify, defend, and

## ATTACHMENT 2

W:\WDOX\CLIENTS\SCL\001\00078981.WPD
Franchise Agreement - Special Release of Claims
Issued March 1, 2014
Revised May 15, 2014

# PERSONAL GUARANTY AND SUBORDINATION AGREEMENT

To induce Steri-Clean, Inc. (Franchisor) to enter into or permit assignment of a STERI-CLEAN® franchise agreement (Franchise Agreement) with _____ [franchisee's full legal name] (Franchisee), signed on the same date as the date of this Guaranty, the undersigned unconditionally, jointly and severally, personally guaranty to Franchisor, its successors, or its assignees, the prompt full payment and performance of all obligations of Franchisee that are or may become due and owing to Franchisor, including, but not limited to, all obligations arising out of the Franchise Agreement and any other agreement between the parties and all extensions or renewals of it or them in the same manner as if the Franchise Agreement were signed between Franchisor and the undersigned, as franchisee, directly.

The undersigned expressly waive notice of acceptance by Franchisor to or for the benefit of Franchisee, of the purchase of inventory and goods by Franchisee, the maturing of bills and the failure to pay the same, the incurring by Franchisee of any additional future obligations and liability to Franchisor, and any other notices and demands. This Personal Guaranty will not be affected by the modification, extension, or renewal of any agreement between Franchisor and Franchisee, the taking of a note or other obligation from Franchisee or others, the taking of security for payment, the granting of an extension of time for payment, the filing by or against Franchisee of bankruptcy, insolvency, reorganization, or other debtor relief afforded Franchisee under the Federal Bankruptcy Act or any other state or federal statute or by the decision of any court, or any other matter, whether similar or dissimilar to any of the foregoing, and this Personal Guaranty will cover the terms and obligations of any modifications, notes, security agreements, extensions, or renewals. The obligations of the undersigned will be unconditional in spite of any defect in the Franchisee's obligations or liability to Franchisor or any other circumstances whether or not referred to in this Guaranty that might otherwise be a legal or equitable discharge of a surety or guarantor.

This is an irrevocable, unconditional, and absolute guaranty of payment and performance and the undersigned agrees that the undersigned's liability under this guaranty will be immediate and will not be contingent upon the exercise or enforcement by Franchisor of whatever remedies it may have against the Franchisee or others, or the enforcement of any lien or realization upon any security that Franchisor may possess.

The undersigned agrees that any current or future indebtedness by the Franchisee to the undersigned will always be subordinate to any indebtedness owed by Franchisee to Franchisor. The undersigned will promptly modify any financing statements on file with state agencies to specify that Franchisor's rights are senior to those of Guarantor.

The undersigned further agrees that while the Franchisee owes any money to Franchisor (other than royalty and marketing fund payments that are not past due), the Franchisee will not pay and the undersigned will not accept payment of any part of any indebtedness owed by Franchisee to any of the undersigned, either directly or indirectly, without the consent of Franchisor.

In connection with any litigation or arbitration to decide the undersigned's liability under this Personal Guaranty, the undersigned expressly waives the undersigned's right to trial by jury, if any, and agrees to pay costs and reasonable attorney fees as fixed by the court or arbitrator.

If more than one individual has signed this Personal Guaranty or if they have signed

more than one Personal Guaranty, each person signing a Personal Guaranty will be jointly and severally liable for the obligations created in it.

This Personal Guaranty will remain in full force and effect until all obligations arising out of and under the Franchise Agreement, including all renewals and extensions, are fully paid and satisfied.

IN WITNESS TO THE ABOVE, the undersigned signed this guaranty on ___12 - 22 - 2014___ [date].

Signature: _____

Print Name: THOMAS DIMATTINA

Signature: _____

Print Name: Thomas B DiMattina

Signature: _____

Print Name: _____

-ii-

# AUTHORIZATION AGREEMENT FOR PREARRANGED PAYMENT (DIRECT DEBIT)

The undersigned depositor (Depositor) authorizes Steri-Clean, Inc. (SCI) to request debit entries and/or credit correction entries to the Depositor's checking and savings account(s) indicated below and the depository (Depository) to debit the account according to SCI's instructions.

_Suntrust_
Depository

_Pembroke Pines_
Branch

_10000 TAFT ST. Fl. 33024_
Street Address, City, State, Zip Code

_063102152_
Bank Transit/ABA Number

_1000181286906_
Account Number

This authorization is to remain in full force and effect until Depository has received joint written notification from SCI and Depositor of the Depositor's termination of the authorization in a time and manner that will give Depository a reasonable opportunity to act on it. In spite of this, Depository will give SCI and Depositor thirty (30) days' prior written notice of the termination of this authorization. If an incorrect debit entry is made to Depositor's account, Depositor will have the right to have the amount of the entry credited to the account by Depository, if within fifteen (15) calendar days following the date on which Depository sent to Depositor a statement of account or a written notice pertaining to the entry or forty-five (45) days after posting, whichever occurs first, Depositor has sent Depository a written notice identifying the entry, stating that the entry was in error, and requesting Depository to credit the amount to the account. These rights are in addition to any rights Depositor may have under federal and state banking laws.

_THOMAS DiMATTIVA_
Depositor

By

_MGR_
Title

_12/22/2014_
Date

Depository

By

Title

Date

# ASSIGNMENT OF TELEPHONE NUMBERS, EMAIL ADDRESSES AND WEB ADDRESSES AND SPECIAL POWER OF ATTORNEY

1. ███████████████ [Franchisee's legal name] ("Franchisee") assigns Steri-Clean, Inc. ("SCI") to grant Franchisee a franchise, assigns to SCI all telephone numbers, email addresses, web addresses and listings (collectively "Addresses") that Franchisee advertises, publicizes, or otherwise makes known to clients or the public in the operation of a STERI-CLEAN® Service, both now and in the future, in the city where the Service is operated to induce SCI to grant Franchisee a franchise.

2. This assignment will automatically become effective immediately upon Termination (meaning "termination, expiration, or nonrenewal") of Franchisee's STERI-CLEAN® franchise. When the franchise is terminated, Franchisee agrees to do whatever is necessary to cause the companies providing service to the Service to promptly transfer its Addresses to SCI or its designee.

3. Franchisee agrees to pay these service providers, on or before the date when the franchise is Terminated, all amounts Franchisee owes it in connection with the Addresses, including payment for any advertisements or listings in a classified directory or directories. Franchisee further agrees to indemnify SCI for any money SCI must pay the service providers before the service providers will carry out this agreement.

**THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK**

4. Franchisee appoints SCI as attorney-in-fact to sign any documents and do any things necessary to carry out this agreement if Franchisee fails to sign or do them within three (3) business days after Termination of the Franchise Agreement. Franchisee further agrees to indemnify SCI for any expenses, including legal fees, that SCI incurs which SCI would not have incurred if Franchisee had performed as promised under this agreement.

*Sign here if Franchisee is an individual:*

FRANCHISEE

Date:_____

Print Name:_____

_____

*Sign here if Franchisee is a company:*

FRANCHISEE
Print Company Name:        Dimattina Holdings LLC

Date: 1-5-2015

Print Name:    THOMAS R. DIMATTINA

Print Title:    MNGR

-ii-

# YOUR OWNERS

You (the franchisee) are:

- ☐ An individual
- ☐ A married couple (marital community) or living trust
- ☐ A general partnership
- ☐ A limited partnership
- ☐ A corporation
- ☑ A limited liability company

The following individuals or entities* are all of the owners of the franchised Service:

| NAME | ADDRESS | PERCENT |
|------|---------|---------|
| Thomas Robert DiMattina | 9631 NW 26 Court, Cooper City, FL, 33024 | 51% |
| Thomas Bradley DiMattina | | 49% |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| TOTAL | .................................................... | 100% |

*For each owner that is an entity, please attach a page showing names, addresses and ownership percentages of its owners.

## ATTACHMENT 7

W:\WDOX\CLIENTS\SCL\001\00076881.WPD
Franchise Agreement - Your Owners
Issued March 1, 2014
Revised May 15, 2014

# STERI-CLEAN®

# CLOSING QUESTIONNAIRE

| | |
|---|---|
| 1. | Full legal name of franchisee (responsible party on the franchise agreement): |
| | DIMATTINA HOLDINGS LLC. |
| 2. | Address: |
| | 9631 NW 26 ct. cooper City Fl. 33024 |
| 3. | The franchisee is: ( Please check applicable box) |
| | ☐ An individual    ☐ A general partnership   ☒ A limited liability company |
| | ☐ A corporation   ☐ A limited partnership   ☐ A married couple |
| 4. | If the franchisee is not an individual, indicate the capacity in which the undersigned is authorized to bind the franchisee: (Please check applicable box) |
| | ☐ Officer (insert title): |
| | ☒ Managing Member |
| | ☐ General Partner |
| | ☐ Other (please explain): |
| 5. | Have you received a franchise disclosure document? |
| | ☒ Yes        ☐ No |
| 6. | On what date was the disclosure document received, and by whom? |
| | Recipient: THOMAS DIMATTINA |
| | Date: 12-1-2014 |
| 7. | Below, please indicate the agreements you are going to sign in connection with the purchase of the franchise and the dates when signature-ready filled-in agreements were delivered to you: |

| AGREEMENT | DATE |
|---|---|
| ☒ Franchise Agreement | 12-22-2014 |

| | |
|---|---|
| ☒ Assignment of Telephone Numbers, Email and Web Addresses and Special Power of Attorney | |
| ☒ Nondisclosure and Noncompetition Agreement | |
| ☒ Personal Guaranty and Subordination Agreement | |
| ☒ Authorization Agreement for Prearranged Payment | |

8. Name(s) of franchise seller(s) handling this sale for Steri-Clean:

THOMAS DIMATTINA

9. Were any oral or written statements made to you by Steri-Clean, the franchise seller(s) listed above, or any other representatives of Steri-Clean concerning the actual sales, profits or earnings of any franchised or company-owned outlets or potential sales, profits or earnings that could be anticipated for your outlet?

   ☐ Yes   ☒ No   If yes, please explain in detail (attach additional sheet if necessary) and if none, write "none":

10. Have you carefully reviewed the disclosure document, the franchise agreement and the other agreements?

   ☒ Yes   ☐ No   If no, please explain:

11. Do you understand the disclosure document, the franchise agreement and the other agreements?

   ☒ Yes   ☐ No   If no, please explain:

12. Did you ask Steri-Clean any questions concerning the disclosure document or other agreements that were not satisfactorily answered?

   ☒ Yes   ☒ No   If yes, please explain:

-2-

13. Did the seller or sellers listed above, or any other employee or representative of Steri-Clean, make any statement to you which is inconsistent with the information in the disclosure document?

☐ Yes   ☒ No   If yes, please explain:

14. Did you contact other franchisees of Steri-Clean to discuss your possible purchase of the franchise?

☒ Yes   ☐ No

15. If your answer to question 14 was yes, please identify these franchisees (attach extra sheet if necessary):

1) AMBER VOSS          2)

3)                             4)

5)                             6)

7)                             8)

16. Did you employ an attorney to give advice to you concerning this franchise?

☐ Yes   ☒ No   If yes, please insert the name, address, and telephone number of the attorney:

(     )

17. Did you consult with an accountant or other financial advisor in connection with the purchase of this franchise?

☐ Yes   ☒ No   If yes, please insert (below) the name, address and telephone number of the accountant or financial advisor:

-3-